2129

Ronald H. GAMBRELL, John Redd, Danny Kelly, Donny and Deloris Hill, William Chandler, Steve McWhorter, Phillip Maxwell, Tommy Campbell, William H. Lusk, Curtis and Rosemary Moore, Steve and Linda Wilson, Jack E. and Sarah Frances Ashley, Mike Hughes and Larry Bryant, South Carolina Individuals, Appellants v. Evelyn P. SCHRIVER, Melven C. Powell and Sherry M. Powell, and Sammy C. Posey, South Carolina Individuals, Respondents.

(440 S.E. (2d) 393)

Court of Appeals

*J. Stephen Welch,* of *Welch & Associates,* Greenwood, *for appellants.*

*W. Richard McClellion,* Anderson, *for respondents.*

Heard Dec. 7, 1993. Decided Jan. 24, 1994.

Reh. Den. Mar. 3, 1994.

CURETON, Judge:

Ronald Gambrell and others (collectively "Gambrell") brought an action against Evelyn Schriver and others (collectively "Schriver")[1] for an order declaring certain real property in a subdivision subject to a negative reciprocal easement against mobile homes. They also sought damages and injunctive relief. Schriver counterclaimed for slander of title. The circuit court issued a temporary injunction and referred the matter to the master-in-equity for final judgment with direct appeal to the Supreme Court. Schriver's counterclaim was severed from the main action and placed on the jury roster. The master denied the request for injunctive relief, and declared the property not subject to negative reciprocal restrictions, covenants or conditions. Gambrell appeals. We affirm.

Since this is an action for injunctive relief which is equitable in nature and it was tried by a judge alone, this court has jurisdiction to find facts in accordance with our own view of the preponderance of the evidence. *Butler v. Sea Pines Plantation Co.,* 282 S.C. 113, 317 S.E. (2d) 464 (1984).

The property involved in this dispute is referred to as the Estate of Emmie Pinson (Pinson estate) and originally totaled

---

[1] The respondents' brief states that Melven Powell, Sherry Powell and Sammy Posey required Evelyn Schriver to re-purchase their interests in the property, and that the Powells and Posey are not participating in this appeal. The Clerk of this court's file, however, does not indicate that they have notified the Clerk of their withdrawal, and the caption has not been amended to reflect a withdrawal by them.

about 320 acres. Approximately 44 acres of this tract were conveyed by Mrs. Pinson to her son, leaving 276.921 acres. Prior to her death in 1972, Mrs. Pinson sold about 50 individual lots from the remaining property which accounted for about 25 percent of the land. All of these lot sales were restricted by covenants placed in individual deeds. However, no blanket or general restriction was placed on this property. After Pinson's death, the balance of the property was divided among her six children.

There were a total of 64 deeds of property from or within the Pinson tract. Six of these deeds partition property among the Pinson heirs and contain no restrictions. Of the remaining 58 deeds to persons outside the Pinson family, 55 contain restrictions. While the restrictions are similar on several of these deeds, the only restriction which can be found on all of the deeds states the property "shall be used for residential purposes only."

The tract which is the subject of this controversy was deeded to Schriver by Douglas Mosteller, Jr. who was a grantee of one of the Pinson grandchildren, Dwight Pettus. Neither the deed to Mosteller nor to Schriver contains a restriction against mobile homes.

Gambrell contends a negative reciprocal easement was created over the entire 320-acre tract by the individual restrictions in the deeds from Emmie Pinson and the heirs of Mrs. Pinson. Gambrell further asserts that he and the other adjoining landowners purchased property and developed residential estates in reliance upon the restrictions in the deeds, and in reliance upon the representations of the Pinson heirs.

The master found no evidence showing a common scheme of restrictions covering the lot sales. Rather, each lot was restricted by covenants placed in the individual deeds. He further noted that while the covenants were similar on several of the deeds, the only covenant which can be found on all of the deeds states the property "shall be used for residential purposes only." We agree with the master in holding there is no valid reciprocal negative easement Gambrell can enforce.

Covenants, expressed or implied, restricting the free use of land are not favored and must be strictly construed. *Edwards v. Surratt*, 228 S.C. 512, 90 S.E. (2d)

906 (1956). An easement restricting the use of property must be created in express terms or by plain and unmistakable implication. *Bomar v. Echols,* 270 S.C. 676, 244 S.E. (2d) 308 (1978); *Shoney's, Inc. v. Cooke,* 291 S.C. 307, 353 S.E. (2d) 300 (Ct. App. 1987). Where they arise by implication and subdivided land is involved, the restrictions are said to create a reciprocal negative easement. *Bomar,* 244 S.E. (2d) at 310. Ordinarily, four elements must be established to show a reciprocal negative easement. There must be: (1) a common grantor, (2) a designation of land subject to restrictions, (3) a general plan or scheme of restrictions, and (4) covenants running with the land in accordance with such plan or scheme. *Id.; see also Shipyard Property Owners Ass'n v. Mangiaracina,* 307 S.C. 299, 414 S.E. (2d) 795 (Ct. App.1992).

In the various grants of the lots, there must have been included some restriction for the benefit of the land retained, evidencing a scheme or intent that the entire tract shall be similarly treated, so that once the plan has been effectively put into operation, the burden placed upon the land conveyed is by operation of law reciprocally placed upon the land retained. 20 Am. Jur. (2d) *Covenants, Conditions, Etc.* § 173 (1965). In determining whether a reciprocal negative easement has been created, the court should consider not only the language of the deeds, but also the circumstances surrounding the origin of the covenants. *Nance v. Waldrop,* 258 S.C. 69, 187 S.E. (2d) 226 (1972). Generally, the developer must establish the general scheme of development before any lots are sold. To establish a general scheme, it is not necessary for every lot to be restricted in exactly the same manner, but extensive omissions or variations tend to show no scheme existed and the restrictions are only personal contracts. *Shipyard Property Owners Ass'n,* 414 S.E. (2d) at 802. All doubts regarding the creation of an implied reciprocal negative easement must be resolved in favor of the freedom of land from restriction. *Bomar,* 244 S.E. (2d) at 310.

After examining the words of the various restrictions placed in the individual deeds, the plat, and the surrounding circumstances, we conclude that Gambrell failed to establish a common plan or scheme for development of the entire Pinson tract which restricted mobile homes. The subdivided land involved here never contained a general or blanket restriction

and never gave Gambrell and other adjoining property owners the express right to enforce any restriction. Therefore, any such right may arise only by plain and unmistakable implication.

The evidence and testimony in this record do not support the existence of a general scheme or plan applicable to the entire Pinson tract which is "plain and unmistakable." The majority of the property passing through Emmie Pinson's estate remained unrestricted at the time of trial. The heir who now owns the largest portion of the Pinson estate testified that the property was not burdened in a legal sense. Instead, he was only morally obligated not to devalue the property. He further stated that after the death of Emmie Pinson, the heirs were responsible for restricting the property as they saw fit.

Thus, we conclude, as did the master, that a general scheme or plan was not in effect and that the restrictions in the deeds from Emmie Pinson and her heirs apply only to the lots conveyed by those deeds.

Affirmed.

HOWELL, C.J., and GOOLSBY, J., concur.