THIS OPINION
 HAS NO PRECEDENTIAL VALUE.  IT SHOULD NOT BE CITED OR RELIED ON AS PRECEDENT IN
 ANY PROCEEDING EXCEPT AS PROVIDED BY RULE 268(d)(2), SCACR.
THE STATE OF SOUTH CAROLINA
In The Court of Appeals

 
 
 
 Ben J. Nash
 d/b/a B&B Rentals, Billy F. Stegall, Jr. and Joseph H. Stegall, Appellants,
 v.
 The Tara
 Plantation Homeowners Association, Inc., Respondent,
 and The Tara
 Plantation Homeowners Association, Inc., Respondent,
 v.
 William
 Howarth, Paige Howarth, Shirley Vaillancourt, Courtlandt Stone, J. Carroll
 Robinson, Connie Robinson, Alan G. Crump, and Patricia D. Crump, Appellants.
 
 
 

 

Appeal From York County
 S. Jackson Kimball, III, Circuit Court
 Judge
Unpublished Opinion No.  2010-UP-355
Heard May 18, 2010 Filed July 12, 2010
AFFIRMED

 
 
 
 Daniel J. Ballou and Tracy T. Vann, of Rock Hill, for Appellants.
 Brian Scott McCoy and Horack Talley, of Rock Hill, for Respondent.
 
 
 

PER CURIAM:  Ben J. Nash, d/b/a B&B Rentals, and the other Appellants appeal the trial court's
 ruling that restrictive covenants for Tara Plantation subdivision apply to
 their lots.  We affirm.  
FACTS/PROCEDURAL HISTORY
Bob
 McLemore (Developer), acting in several corporate names, was the developer of
 Tara Plantation subdivision near Fort Mill, South Carolina.  On February 16,
 1988, Developer filed a plat entitled "A Final Plat Showing Maco
 Commercial Park and Tara Plantation."  Notes on the plat provided:
 "Tara Plantation Lots 1-57 zoned RD-1", which meant residential use,
 and "Maco Commercial Park Lots A-F zoned BD-1", which meant
 commercial use.  The lots in the Maco Commercial Park (Maco Lots) were at the
 front of the property owned by Developer on either side of Old Tara Lane.  The
 plat was filed in Plat Book 91 at Page 128 of the York County RMC Office.  On
 February 25, 1988, Developer filed restrictive covenants (Covenants), which
 provided:

 KNOW
 ALL PERSONS BY THESE PRESENTS, THAT BOB MCLEMORE AND CO., INC., being the owner
 of the real property located in Fort Mill Township, York County, South
 Carolina, constituting that certain subdivision known as Tara Plantation, a map
 of which is recorded in Plat Book 91 at Page 129 of the York
 County, South Carolina, RMC office, does hereby covenant and agree with all
 persons, firms or corporations hereafter acquiring any of the lots shown on
 said map, that said lots shall be subject to the following restrictive
 covenants, governing the use thereof, which shall run with the property by
 whomsoever owned.  

The
 Covenants provided:  "All lots shown on said map shall be used for
 residential purposes only."  In addition, the Covenants stated: 
 "Nothing herein contained shall be construed as imposing any covenants and
 restrictions on any property of the owner of this subdivision other than the
 property to which these restrictive covenants specifically apply."  The Covenants
 do not expressly exclude or include the Maco Lots.  
A
 plat substantially similar to the original plat was filed at Book 95, page
 136.  Developer, as Bob McLemore Homes (BMH) built a model home on Maco Lot B. 
 Developer sold Maco Lot F to Alan and Patricia Crump on April 10, 1992.  Lots
 B, C, E, and F were rezoned for residential use on June 15, 1992.  The
 remaining lots were rezoned for residential use on April 18, 1994.  On April
 22, 1994, a plat was filed showing a revision of Lots A, B, C, D, and E of Maco
 Commercial Park to be known as Lots 61-67 of Tara Plantation.  In 1995,
 Developer as BMH defaulted on the mortgage on Lot B.  Home Federal Savings and
 Loan Association, which acquired title at the foreclosure sale, sold the
 property to the Mitchells.  The current owners, Paige and William Howarth
 acquired the property after it was foreclosed.  Developer filed for bankruptcy
 in October of 1994.  The bankruptcy trustee sold Lots 61-63 (formerly Maco Lots
 C-D) and Lot 65 (formerly Lot A), while Developer sold the remaining lot in
 1996.  The Appellants are the current owners of what were the Maco Lots.  
Ben
 J. Nash, Billy F. Stegall, Jr., and Joseph H. Stegall, the current owners of
 what are now known as Lots 61 and 62 of Tara Plantation, brought this
 declaratory judgment action against the Tara Plantation Homeowners Association
 (TPHOA) requesting the court declare their lots unencumbered by the Covenants. 
 The TPHOA asserted a counterclaim against Nash and the Stegalls and a third party
 claim against the other owners of the former Maco Lots seeking a declaration
 the lots were subject to the Covenants and seeking collection of homeowner
 association dues owed by the Appellants.  
The
 trial court ruled the Covenants applied to the disputed lots based on the plain
 language of the Covenants.  In addition, the court held even if an ambiguity
 exists, Developer intended for the Covenants to apply to all lots on the plat,
 including the disputed lots.  Furthermore, the court ruled Appellants were
 estopped from asserting the Covenants did not apply to them, waived such
 contention, and were barred by the doctrine of laches.  The court granted the
 TPHOA judgment against the Appellants for the dues owed.  This appeal
 followed.  
STANDARD OF REVIEW
A declaratory
 judgment action is neither legal nor equitable, but is determined by the nature
 of the underlying issue.  Felts v. Richland County, 303 S.C. 354, 356,
 400 S.E.2d 781, 782 (1991).  The underlying issue in this case is whether the
 restrictive covenants can be enforced against the Appellants' lots.  An action
 to enforce restrictive covenants is an action in equity.  Buffington v.
 T.O.E. Enter., 383 S.C. 388, 393, 680 S.E.2d 289, 291 (2009); see also Hardy v. Aiken, 369 S.C. 160, 165, 631 S.E.2d 539, 541 (2006) (stating
 while action potentially might require the court to construe a contract, the
 underlying action was a declaratory action to declare whether the restrictive
 covenants were enforceable and thus the standard of review was for an action in
 equity).  On appeal from an equitable action, an appellate court may find facts
 in accordance with its own view of the evidence.  Townes Assocs. v. City of
 Greenville, 266 S.C. 81, 86, 221 S.E.2d 773, 775 (1976).  While this
 standard permits a broad scope of review, an appellate court will not disregard
 the findings of the trial court, which saw and heard the witnesses and was in a
 better position to evaluate their credibility.  Tiger, Inc. v. Fisher Agro,
 Inc., 301 S.C. 229, 237, 391 S.E.2d 538, 543 (1989).
LAW/ANALYSIS
A.  Applicability of
 Covenants
Appellants argue
 the trial court erred in concluding the Covenants apply to their lots.  We
 disagree.  
Restrictive
 covenants are contractual in nature.  Hardy, 369 S.C. at 166, 631 S.E.2d
 at 542.  A restriction on the use of the property must be created in express
 terms or by plain and unmistakable implication.  Id.  Restrictions on
 the use of property will be strictly construed with all doubts resolved in
 favor of free use of the property; however the rule of strict construction
 should not be used to defeat the plain and obvious purpose of the restrictive
 covenants.  Taylor v. Lindsey, 332 S.C. 1, 4, 498 S.E.2d 862, 863
 (1998).  The language of a restrictive covenant is to be construed according to
 the plain and ordinary meaning attributed to it at the time of execution.  Id.
A
 restrictive covenant is ambiguous when its terms are reasonably susceptible of
 more than one interpretation.  S.C. Dep't of Natural Res. v. Town of
 McClellanville, 345 S.C. 617, 623, 550 S.E.2d 299, 302 (2001).  It is a
 question of law for the court whether the language of a restrictive covenant is
 ambiguous.  Id. at 623, 550 S.E.2d at 302-03.  Once the court decides
 the language is ambiguous, evidence may be admitted to show the parties' intent.  Id.  at 623, 550 S.E.2d at 303.  The determination of intent is then a
 question of fact.  Id. 
When
 restrictive covenants arise by implication, the restrictions are said to create
 a reciprocal negative easement.  Bomar v. Echols, 270 S.C. 676, 679, 244
 S.E.2d 308, 310 (1978).[1]  Generally, four elements must be established to show a reciprocal negative
 easement:  (1) a common grantor, (2) a designation of land subject to
 restrictions, (3) a general plan or scheme of restrictions, and (4) the
 covenants run with the land.  Id.  In the various grants of the lots,
 there must have been included some restriction for the benefit of the land
 retained evidencing a scheme or intent that the entire tract would be similarly
 treated, so that once the plan has been effectively put into operation, the
 burden placed upon the land conveyed is by operation of law reciprocally placed
 upon the land retained.  Gambrell v. Schriver, 312 S.C. 354, 358, 440
 S.E.2d 393, 395 (Ct. App. 1994).  In determining whether a reciprocal negative
 easement has been created, the court should consider not only the language of
 the deeds, but also the circumstances surrounding the origin of the covenants.  Id. 
 Generally, the developer must establish the general scheme of development
 before any lots are sold.  Id.  All doubts regarding the creation of an
 implied reciprocal negative easement must be resolved in favor of the freedom
 of land from restriction.  Id.
The
 Covenants state they apply to "any of the lots shown on [the] map"
 recorded in Plat Book 91, Page 129, which is the plat showing the Tara
 Plantation Lots, as well as the Maco Lots.  The Covenants do not expressly exclude
 the Maco Lots.  However, the Covenants, which provide the lots will be used for
 residential purposes only, are in conflict with the Plat, which states the Maco
 Lots are zoned for commercial use.  
Developer's
 brother Danny Charles McLemore, who served as Director of Sales for his
 brother's company, testified that in developing a subdivision, Developer would
 have the front of the property zoned commercial and place a model home there. 
 He would then use the model home for sales to the public, would hold real
 estate days there, and would allow dignitaries to use it for dinners.  Once the
 subdivision was finished, Developer would have the model home rezoned
 residential and would place the same restrictions on it as the rest of the
 subdivision.  He stated he had "always thought [the Maco Lots] would be
 back as residential homes."  At the time he left Developer's company, the
 Maco Lots were all vacant except for the model home.  Shortly thereafter, the
 company went bankrupt.  
Developer's son,
 Thad McLemore, who was Assistant Vice President for his father's company, testified
 the original intent for the subdivision was for all of the lots to be
 residential.  The application to rezone lots B, C, E, and F as residential lots
 stated the reason for the rezoning was to keep with the original intent for the
 subdivision.  
The evidence shows
 Developer intended for the restrictive covenants to apply to all of the lots
 shown on the Plat once they were sold to homeowners, including the Maco Lots.  Developer
 established a general scheme of development before any of the lots were sold
 and designated the lots shown on the Plat as being subject to the restrictive
 covenants.  As the Maco Lots were rezoned residential, the conflict with the
 restrictive covenants was removed.  The evidence shows the only reason
 Developer originally had the Maco Lots zoned commercial was to allow for the
 model home to be used for sales and similar purposes.  The model home,
 otherwise, was consistent with the requirements of the Covenants.  A revised
 plat was filed to show that the Maco Lots were renamed as Tara Plantation Lots. 
 All of the Appellants except the Crumps acquired their lots after the revision
 and their deeds designate their lots as being part of Tara Plantation. 
 Although the Crumps purchased their lot from Developer before the renaming of the
 Maco Lots, their lot was rezoned residential after they entered into a
 contract.  Furthermore, the Crumps' mortgage refers to their property as
 "Lot F, Tara Plantation."  
The Appellants were
 aware of the restrictions and all of them paid dues to the TPHOA.  In addition,
 many of the Appellants voted on amendments to the Covenants and participated in
 TPHOA meetings.  On May 19, 2005, lead plaintiff Nash wrote to the president of
 the TPHOA requesting a release of his lots from the Covenants.  
Considering all of
 the surrounding circumstances, we find Developer intended for the Covenants to
 apply to Appellants' lots.  Accordingly, we find the trial court did not err in
 holding the Covenants could be enforced against Appellants.  
B.  Estoppel and waiver
The Appellants
 argue the trial court improperly held they were barred from asserting the
 restrictive covenants did not apply to their lots under the equitable doctrines
 of estoppel and waiver.  We disagree.   
The Appellants
 claim these doctrines are not applicable because they cannot be used as
 offensive weapons.  

 Estoppel
 and waiver are protective only, and are to be invoked as shields, and not as
 offensive weapons. Their operation in all cases should be limited to saving
 harmless or making whole the party in whose favor they arise and should not, in
 any case, be made the instruments of gain or profit. While the doctrine of
 waiver or equitable estoppel may be invoked as affirmative defenses to
 counterclaims, they may not be asserted in a complaint as offensive weapons. 
 

Janasik v. Fairway Oaks
 Villas Horizontal Prop. Regime, 307 S.C.
 339, 345, 415 S.E.2d 384, 388 (1992) (citations omitted).  
In Janasick,
 homeowners sought an injunction to prevent a regime and management company from
 requiring them to remove improvements constructed in violation of covenants.  Id.  at 341, 415 S.E.2d at 386.  They asserted in their complaint equitable
 estoppel and waiver.  Id.  The regime and management company
 counterclaimed seeking an injunction enforcing the covenants.  Id. at
 342, 415 S.E.2d at 386.  While the supreme court affirmed the master's finding that
 evidence supported the homeowners' entitlement to benefits arising in their
 favor under equitable considerations, it reversed to the extent his ruling let
 stand those portions of the complaint that alleged the affirmative defenses of
 equitable estoppel and waiver.  Id. at 345, 415 S.E.2d at 388.  
The TPHOA
 is the party seeking to maintain the status quo and is using the equitable
 doctrines of estoppel and waiver as "shields."  The TPHOA did not
 assert the equitable doctrines in a complaint but rather in response to Nash's
 and the Stegalls' claims.  The other Appellants asserted a counterclaim asking
 for a declaration that the Covenants do not apply.  Although there is not a
 responsive pleading to this counterclaim in the record, the Appellants do not
 raise any issue concerning the lack of the responsive pleading.  We find Janasek does not prevent the TPHOA's use of these doctrines.  
The
 Appellants also assert the equitable doctrines may only be used to bar
 enforcement of covenants.  However, this is an action in equity.  The appellate
 courts have "consistently held that courts should consider equitable
 doctrines when determining whether to enforce a restrictive covenant . . .
 ."  Buffington v. T.O.E. Enter., 383 S.C. 388, 393, 680 S.E.2d 289,
 291 (2009).  
In Seabrook
 Island Property Owners Association v. Pelzer, 292 S.C. 343, 348, 356 S.E.2d
 411, 414 (Ct. App. 1987), this court found the appellant was estopped from
 seeing a refund of assessments, even though the assessment violated the
 applicable restrictive covenants and bylaws.  The court held:

 [The
 appellant] acquiesced in the method of assessment and paid the charges. The
 Association expended the moneys for purposes authorized by the by-laws.  [The
 appellant] received the benefit of those expenditures.  He cannot now return
 the benefits or restore the Association to its former position . . . .  If a
 party stands by and sees another dealing with his property in a manner
 inconsistent with his rights and makes no objection while the other changes his
 position, his silence is acquiescence and it estops him from later seeking
 relief.

Id.
We
 find the trial court did not err in considering the equitable doctrines.  
We
 next consider whether the trial court erred in its application of the
 doctrines.  "The doctrine of estoppel applies if a person, by his actions,
 conduct, words or silence which amounts to a representation, or a concealment
 of material facts, causes another to alter his position to his prejudice or
 injury."  Rushing v. McKinney, 370 S.C. 280, 293, 633 S.E.2d 917,
 924 (Ct. App. 2006)  The elements of equitable estoppel as to the party
 estopped are:  (1) conduct amounting to a false representation or concealment
 of material facts, or, at least, which is calculated to convey the impression
 that the facts are otherwise than, and inconsistent with, those which the party
 subsequently attempts to assert; (2) the intention or expectation that such conduct
 will be acted upon by the other party; and (3) actual or constructive knowledge
 of the real facts.  S. Dev. Land & Golf Co., v. S.C. Pub. Serv. Auth.,
 311 S.C. 29, 33, 426 S.E.2d 748, 750 (1993).  The elements as to the party
 claiming the estoppel, are:  (1) lack of knowledge and of the means of
 knowledge of the truth as to the facts in question, (2) reliance upon the
 conduct of the party estopped, and (3) prejudicial change in position.  Id.
Waiver is defined
 as "a voluntary and intentional abandonment or relinquishment of a known
 right. Generally, the party claiming waiver must show that the party against
 whom waiver is asserted possessed, at the time, actual or constructive
 knowledge of his rights or of all the material facts upon which they
 depended."  Janasik, 307 S.C. at 344, 415 S.E.2d at 387-88. 
 "The doctrine of waiver does not necessarily imply that the party
 asserting waiver has been misled to his prejudice or into an altered
 position."  Id. at 344, 415 S.E.2d at 388.
As stated above,
 the Appellants paid dues, voted on TPHOA issues, and participated in meetings
 for years before asserting their lots were not bound by the Covenants.  The
 Appellants had access to the same facts that give rise to their current
 contention they are not bound by the Covenants.  During this time, the TPHOA
 maintained the entranceway to the subdivision with landscaping, lighting, and
 placement of a sign.  Until Nash and the Stegalls brought this action in
 December of 2005, none of the Appellants took any action inconsistent with their
 lots being bound.  The trial court held:  The TPHOA was "prejudiced by the
 [Appellants'] delay by spending money and effort regarding the landscaping
 improvements, sign and lights adjacent to the [Appellants'] properties, all of
 which implicitly considered the disputed lots as part of the subdivision and
 was done without any reason to believe such a contention would be made."  We
 find the evidence supports this finding.  Accordingly, we find no error in the
 trial court's ruling that the Appellants are estopped from or have waived their
 contention the Covenants do not apply to their lots.[2]  
CONCLUSION
For the above
 stated reason, the order of the trial court is 
AFFIRMED.
HUFF, SHORT, and
 WILLIAMS, JJ., concur.  

[1]  Appellants assert the issue of negative reciprocal easement is not preserved. 
 This court may affirm for any ground appearing in the record.  I'On v. Town
 of Mt. Pleasant, 338 S.C. 406, 418, 526 S.E.2d 716, 722 (2000).  It is not
 always necessary for a respondent-as the winning party in the lower court-to
 present its issues and arguments to the lower court and obtain a ruling on them
 in order to preserve an issue for appellate review.  Id. at 420, 526
 S.E.2d at 723.  Thus, this court may address the issue of negative reciprocal
 easement.  
[2]  We do not reach the issue of laches.  See Futch v. McAllister Towing
 of Georgetown, Inc., 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (stating
 an appellate court need not discuss remaining issues when disposition of prior
 issue is dispositive).