**THIS OPINION HAS NO PRECEDENTIAL VALUE. IT SHOULD NOT BE CITED OR RELIED ON AS PRECEDENT IN ANY PROCEEDING EXCEPT AS PROVIDED BY RULE 268(d)(2), SCACR.**

**THE STATE OF SOUTH CAROLINA**
**In The Court of Appeals**

MAC Coastal Properties, Inc., Appellant-Respondent,

v.

Shoestring Retreat, LLC, Respondent-Appellant.

Appellate Case No. 2022-000545

———

Appeal From Georgetown County
Joe M. Crosby, Master-in-Equity

———

Unpublished Opinion No. 2024-UP-285
Heard June 11, 2024 – Filed July 31, 2024

———

**AFFIRMED IN PART AND REVERSED IN PART**

———

Tobias G. Ward, Jr. and James Derrick Jackson, both of Tobias G. Ward, Jr., PA, of Columbia; Jonathan P. Hanna of Neill Law Firm, PA, of Murrells Inlet; and Willard D. Hanna, Jr., of Hanna Law, PA, of Murrells Inlet, all for Appellant-Respondent.

Robert B. Wallace and Mary Duncan Shahid, both of Maynard Nexsen, PC, of Charleston, for Respondent-Appellant.

———

**PER CURIAM:** This is a set of cross-appeals between MAC Coastal Properties, Inc. (MAC) and Shoestring Retreat, LLC (Shoestring), over enforcement of certain restrictive covenants found in the parties' chains of title. We find that the restrictions at issue run with the land; that there was a common scheme of development for "Retreat Beach," creating reciprocal negative easements enforceable by neighboring property owners; and that Shoestring's property is subject to the "Sand Dunes Restriction." We therefore affirm the master's order in part and reverse in part.

In December 1952, roughly 330 acres in Georgetown County were transferred into a trust (the Boyle Trust). The trustees planned and recorded a plat outlining lots in Retreat Beach roughly one week after the Boyle Trust was formed.

In April 1953, the trustees granted Kate H. Wallace Lot 3 Block 2S of Retreat Beach (the Wallace Deed). The conveyance included certain covenants and restrictions that, among other things, required Wallace and her heirs to only use the property for residential purposes; disallowed subdividing or shrinking the lot without the prior written consent of the grantors; and restricted the number of buildings to one single family home.

The Wallace Deed also granted Wallace an appurtenant easement to cross over a sixty-foot strip of sand dunes that gave Wallace access to the ocean. That easement was subject to restrictions barring Wallace and her heirs and assigns from "alter[ing], tear[ing] down, defac[ing] or do[ing] any act or thing which shall or may change the contour, height[,] or width of the land or of the sand dunes thereon." The Wallace Deed also disallowed the "build[ing of] any structure or walkway, or chang[ing] or remov[ing] any of the growth . . . without [written] approval of the grantors[,]" nor could she "drive, tow, or place in any manner any motor vehicle . . . over, or across [the] . . . land." We refer to this as the "Sand Dunes Restriction" and the applicable area as the "Dunes Restricted Area."

The covenants and restrictions in the Wallace Deed were "made solely for the benefit of the grantors[,]" who retained the right to modify, release, or enforce the restrictions at any time. Later in 1953, the trustees granted Wallace a portion of Lot 2 Block 2S, and that property was combined with the previously-conveyed property subject to the original restrictions and covenants.

The record established that the substantial majority of deeds that the Boyle Trust issued for lots in Retreat Beach contained some iteration of the covenants and restrictions original to the Wallace Deed and at issue here. At trial, the parties introduced thirty-six of those deeds for the court's review. Nearly all deeds in the

record before this court barred subdivision or reconfiguration of the conveyed lots without the grantors' written consent; restricted the number of buildings to one single-family home or duplex; and barred any building upon or alteration of the dunes area. Like the Wallace Deed, these deeds reserved the power to enforce and modify the restrictions to the grantors; however, they also included a restriction against anything that could be deemed a nuisance, or "dangerous to the neighborhood."

In 1959, Thomas B. Boyle, Boyle Construction Co., and the Boyle Trust conveyed the remaining trust property to the North Litchfield Beach Company, Inc. (the North Litchfield Beach Deed). That deed excluded some individual lots in the Retreat Beach plat, including the remainder of Lot 2 Block 2S, and also excluded the Dunes Restricted Area. As to the Dunes Restricted Area, the parties agreed,

> [I]t being specifically agreed, however, by and between the Grantors and the Grantee that the area of land between the lots shown on said plat and the Atlantic Ocean shall never be used for the purpose of erecting any building or structure by the Grantors or the Grantee herein, their heirs or assigns or successors.

Through a series of properly recorded conveyances that need not be detailed here, Kathryn Salley became the owner of a single property comprising a portion of Lot 2 Block 2S, all of Lot 3 Block 2S, the western portion of Lot 2 Block 2S, and all of Lot 1 Block 2S (the Salley Deed). Similarly, through a series of properly recorded conveyances and business dissolutions, mergers, and assignments, MAC became the partial owner of Lots 1 and 4 in Block 2S and a reconfigured portion of Lots 5 and 6 (now named "Lot B") in 1998. This made MAC an adjacent landowner to what is now the Shoestring property.

Salley sold a portion of her property to the Hauns in 1978 (the Haun Deed). The Haun Deed referenced that property as being "a portion of Retreat Beach prepared for [the trustees]," referenced the Dunes Restricted Area between the northern and southern plat lines of Lot 3 as a property line, and referenced the mutual restriction in the North Litchfield Beach Deed. The Haun Deed was conveyed "together with all and singular, the rights, members, hereditaments, and appurtenances to the said Premises belonging or in anywise incident or appertaining." Katharine Haun became the sole owner of the combined lot through quitclaim deed from her husband in 2004. That deed was conveyed "subject to easements and restrictions of record and otherwise affecting the property."

Haun sold her property to Shoestring "subject to all easements as well as covenants of record" and "subject to all applicable restrictions and easements of record" (the Shoestring Deed). The title identifies the property "as shown on a plat of a portion of Retreat Beach prepared for [the trustees] in 1952" and specifically references the Dunes Restricted Area, but does not list any express restrictions. Before conveying the property, however, Haun and Shoestring's owners sought to subdivide the lot into two separate lots through an application with Georgetown County. On that application, Shoestring's owners and/or Haun indicated that there were no known restrictions or covenants that could impede the county's review.

After taking possession of the property, Shoestring had the property surveyed. The first surveyor prepared a survey that identified the Dunes Restricted Area. Shoestring believed that the prohibition on building in the Dunes Restricted Area was unenforceable and sought to have the surveyor remove the notation from the survey. When the surveyor refused, Shoestring sought the services of a second surveyor. The second survey did not include the Dunes Restricted Area. Shoestring used that survey as part of its building permit application. On its building permit application to Georgetown County, Shoestring indicated that there were no restrictions on any portion of its property. Once it received the requisite permits, Shoestring tore down the Haun's former home, demolished the dunes on the eastern portion of the property, and graded the lot—including the dunes.

After receiving complaints, the county issued a stop-work order on the project. This litigation followed. MAC sought injunctive relief against Shoestring and a ruling that Shoestring was subject to the covenants and restrictions in the Wallace Deed.

The master found that the restrictions and covenants ran with the land but held they were only enforceable by the trustees, and became unenforceable when the last trustee died. The master also found Shoestring's property was subject to the Sand Dunes Restriction pursuant to the Salley Deed, ordered Shoestring to restore the dunes it had demolished, held that any building was subject to the county's setback requirements, and enjoined Shoestring from further violation of the deed restrictions.

The parties agree this is an action in equity. This conforms with precedent's treatment of similar past cases. *See, e.g.*, *Gambrell v. Schriver*, 312 S.C. 354, 356, 440 S.E.2d 393, 394 (Ct. App. 1994) (finding that appellate review of an order "declaring certain real property in a subdivision subject to a negative reciprocal easement[s.]" and for injunctive relief was equitable in nature); *Bomar v. Echols*, 270 S.C. 676, 681, 244 S.E.2d 308, 310 (1978) (stating that when there is an action

in equity, "this [c]ourt may make findings in accordance with its own views of the preponderance of the evidence"). We therefore have jurisdiction to "find facts in accordance with our own view of the preponderance of the evidence." *Gambrell*, 312 S.C. at 356, 440 S.E.2d at 394.

This case requires us to examine the language of multiple deeds. "In construing a deed, the intention of the grantor must be ascertained and effectuated, unless that intention contravenes some well[-]settled rule of law or public policy." *Crystal Pines Homeowners Ass'n, Inc. v. Phillips*, 394 S.C. 527, 533, 716 S.E.2d 682, 685 (Ct. App. 2011) (quoting *K & A Acquis. Grp., LLC v. Island Pointe, LLC*, 383 S.C. 563, 581, 682 S.E.2d 252, 262 (2009)). Also, and critically here, "[t]he rule that restrictions as to the use of real estate should be strictly construed and all doubts resolved in favor of the free use of property[] should not be applied in such a way as to defeat the plain and obvious purpose of a contractual instrument of restriction." *McDonald v. Welborn*, 220 S.C. 10, 19, 66 S.E.2d 327, 331 (1951).

South Carolina courts have held "[a] restrictive covenant runs with the land, and is thus enforceable by a successor-in-interest, if the covenanting parties intended that the covenant run with the land, and the covenant touches and concerns the land." *West v. Newberry Elec. Coop.*, 357 S.C. 537, 542, 593 S.E.2d 500, 503 (Ct. App. 2004) (quoting *Marathon Fin. Co. v. HHC Liquidation Corp.*, 325 S.C. 589, 604, 483 S.E.2d 757, 765 (Ct. App. 1997)). In the absence of express terms, restrictive covenants may rise by implication. *Bomar*, 270 S.C. at 679, 244 S.E.2d at 310. Where restrictions arise by implication, they are said to be "reciprocal negative easement[s]." *Id.* Four elements generally establish reciprocal negative easements: (1) presence of a common grantor; (2) "designation of the land or tract subject to restrictions"; (3) existence of "a general plan or scheme of restriction"; and (4) the restrictions must run with the land. *Id.* at 679–80, 244 S.E.2d at 310. "In determining whether reciprocal negative easements have been created, resort should be had not only to the language of the deeds, but 'the circumstances surrounding the origin of covenants should also be considered.'" *Id.* at 680, 244 S.E.2d at 310 (quoting *Nance v. Waldrop*, 258 S.C. 69, 72, 187 S.E.2d 226, 228 (1972), *overruled on other grounds by Taylor v. Lindsey*, 332 S.C. 1, 498 S.E.2d 862 (1998)).

Shoestring argues that the covenants and restrictions at issue here are not enforceable and cannot be reciprocal negative easements because the trustees never intended to create a common scheme of development. Shoestring relies mainly on the trustees' reservation of authority to enforce and modify the covenants for this position. MAC argues the covenants are enforceable and that the master properly held they run with the land, but that the master erred in holding that neighboring property owners could

not enforce them. For the reasons outlined here, we agree with MAC. We accordingly affirm the master's judgment that the covenants in question are appurtenant to the property, reverse the judgment that they are not enforceable by neighboring property owners, and affirm the judgment requiring Shoestring to restore the demolished dunes.

**Restrictions That Touch and Concern the Land**

In *West v. Newberry Electric Coop.*, this court determined that restrictive covenants touched and concerned the land, and were therefore enforceable by subsequent property owners, where the nature of the easement was meant to restrict the manner and use of the land and the parties intended the covenants run with the land. 357 S.C. at 542–43, 593 S.E.2d at 503. There, the court reasoned that easement language dealing with the relocation of power lines in the event of later development sufficiently considered the future use of the property such that the easement ran with the land. *Id.* at 542, 593 S.E.2d at 503. The court further held that restrictive covenants touched and concerned the land where the covenant directly "affect[ed] the nature and value of the easement to both [parties]." *Id.* at 543, 593 S.E.2d at 503.

We find the original Wallace Deed covenants and restrictions touch and concern the land because they contemplate how the lots may be developed. For example, the restrictions require that the land only be used for residential purposes; require that there be no more than one single family dwelling on the property; and reserve an easement "appurtenant to the lot thereby conveyed" to cross from the property to the Atlantic Ocean. These restrictions, like the restrictions in *West*, directly affect how the land may be used, both at the time of the conveyance and in the future. Therefore, we agree with the master that the Wallace Deed restrictions touch and concern the land. *See Epting v. Lexington Water Power Co.*, 177 S.C. 308, 315–17, 181 S.E. 66, 69–70 (1935) (differentiating covenants touching the land from covenants collateral to the land).

**Evidence of a Common Scheme**

We further agree with the master that the lack of complete uniformity between the restrictions in the deeds granted by the Boyle Trust is not fatal to finding a common scheme of development. In *Pitts v. Brown*, our supreme court permitted neighboring landowners to enforce nonidentical restrictions against one another because "the general plan of a residential neighborhood ha[d] been maintained since its inception and . . . th[e] general understanding of use and occupancy ha[d] been accepted, relied on, and acted upon by all of the lot owners." 215 S.C. 122, 129–30, 54 S.E.2d 538,

541–42 (1949). The court further explained the fact that some lots had more or less restrictions than others "does not necessarily interfere with the integrity of a neighborhood scheme[,]" and where certain restrictions "strongly tend to fix the character of the use of the entire tract" the deviations "do[] not disrupt the general neighborhood scheme." *Id.* at 130, 54 S.E.2d at 542. That is because only "extensive omissions or variations tend to show that no scheme exists . . . ." *Id.* at 131, 54 S.E.2d at 542.

To us, this case is analogous to *Pitts*. While there are variations in the deed restrictions in the record, those variations are not extensive and the undeviating restrictions on subdivision, setbacks, and the number of homes permitted strongly tends to fix the character and use central to Retreat Beach. Here, the general purpose of the covenants and restrictions directly addresses the aesthetic and cosmetic integrity of the development. The character of the restrictions, the recording of the plat map before the Boyle Trust ever conveyed any property, and the fact that development in Retreat Beach has not materially deviated from the restrictions is strong evidence of a common plan for development.

Shoestring points us to the fact that the covenants specified they were designed to benefit the trustees, as opposed to neighboring property owners. This does not change our findings that the restrictions and covenants run with the land and that there was a common plan of development. The subject matter of these covenants strongly suggests a purpose of benefitting all property owners in Retreat Beach.

For these reasons, we agree with MAC that there was a common neighborhood plan, and that neither the plan, nor the enforcement rights discussed later in this opinion, evaporated when the Boyle Trust expired, especially when the plan was nearly-perfectly adhered to for over fifty years.

**Shoestring's Notice of Restrictions**

We additionally find that Shoestring had actual notice of the restrictions in its chain of title. "The law imputes to a purchaser of real estate notice of the recitals contained in the written instruments forming his chain of title and charges him with the duty of making such reasonable inquiry and investigation as is suggested by the recitals and references therein contained." *McDonald*, 220 S.C. at 16, 66 S.E.2d at 330 (citation omitted). "If there are circumstances sufficient to put [a purchaser] upon inquiry, he [or she] is held to have notice of everything which that inquiry, properly conducted, would certainly disclose." *Id.*

In *McDonald v. Welborn*, our supreme court found that even though the deeds at issue contained no express restrictions, the property owners were nevertheless on notice of separately recorded restrictions and thus the neighboring property owners could enforce the restrictions as part of the common scheme of development. *Id*. Like the restrictions at issue in *McDonald*, Shoestring acquired the property in question "subject to all applicable restrictions and easements of record," even though there were no express restrictions in the Shoestring Deed. But, unlike the deeds at issue in *McDonald*, the restrictions on Shoestring's property are directly referenced and recorded in its own chain of title.

Here, as in *McDonald*, the record established that the considerable majority of other individual deeds conveyed by the Boyle Trust were recorded with substantially the same restrictions found in Shoestring's chain of title. *Id.* (finding property owners were on notice of the restrictions recorded in their chain of title when deeds of other purchased properties "made reference to the restrictive covenants" and deeds of subsequent conveyance were "incorporated . . . [with] substantially the same reference to the restrictions of record"). Shoestring's title even identifies the property "as shown on a plat of a portion of Retreat Beach prepared for [the trustees] in 1952[.]" Because we find the deed language and surrounding circumstances show the grantors' plain intention to create a common scheme of development, and because we also find that the recorded deeds make sufficient reference to the restrictions in Shoestring's chain of title, and Shoestring's title expressly identifies the property as being within a recorded neighborhood plat, Shoestring is charged with being on notice of the deed restrictions. *See id.* (holding that even though the deed in question contained no express restrictions, the property was nevertheless subject to the recorded restrictions when the deed made "direct reference to the fact that the property was known as [the neighborhood] as shown by the [recorded] plat . . .").

**MAC's Enforcement Rights**

"[I]t is well settled in this state that where the owner of a tract of land subdivides it and sells the distinct parcels thereto to separate grantees, imposing restrictions on its use pursuant to a general plan of development or improvement, such restrictions may be enforced by any grantee against any other grantee[.]" *Bomar*, 270 S.C. at 679, 244 S.E.2d at 310 (quoting *McDonald*, 220 S.C. at 18, 66 S.E.2d at 331). Because we agree with MAC that the restrictions run with the land and that there is a common scheme for development, we also agree that neighboring property owners may enforce the restrictions and covenants. For this reason, the master erred in finding that MAC could not enforce the subdivision, home size, and setback restrictions.

Shoestring contends that there is not a common plan of development and cites *Heffner v. Litchfield Golf Co.*, 258 S.C. 447, 189 S.E.2d 3 (1972), as support for its argument that neighboring property owners cannot enforce these restrictions because the trustees reserved enforcement unto themselves. We respectfully disagree.

We see *Heffner* as materially distinguishable from the circumstances at issue here. *Heffner* dealt with a defendant property owner who "st[ood] simultaneously" as the original grantor and the successor grantee of the property in question. *Id.* at 450, 189 S.E.2d at 5. There, the simultaneous duality in party was material because that deed allowed parties to the original conveyance to change or modify the deed restrictions at any time. *Id.* at 449, 189 S.E.2d at 4. Our supreme court reasoned that because the restrictions specified they were for the mutual benefit of the parties to the deed and could be freely modified by them, neighboring property owners did not have standing to defeat the written instrument's expressed intention. *See id.* at 451, 189 S.E.2d. at 5 ("Mutuality of covenant and consideration, which are essential to the existence of a general scheme of development enforceable, Inter se, by the purchasers of lots in a subdivision, may be implied only when the common grantor manifests his intention to subject the parcels conveyed to common restrictions for the benefit of all grantees."). Because the *Heffner* grantors imposed the restrictions only for the benefit of the parties to the deed, with no intention of benefitting the entire neighborhood, the court held that there was no common scheme. *Id.*

As detailed above, we find that the restrictions imposed by the Boyle Trust were intended to benefit the entire neighborhood of Retreat Beach. It is true that the deeds speak of benefitting the grantor—the Boyle Trust—but we find that the nature of the covenants, and the circumstances surrounding the imposition of the restrictions, strongly suggests an intention to benefit the entire neighborhood. *See Bluestein v. Town of Sullivan's Island*, 429 S.C. 458, 463, 839 S.E.2d 879, 881 (2020) ("In determining the grantor's intent, the deed must be construed as a whole and effect given to every part if it can be done consistently with the law. When the [deed] is ambiguous the court may take into consideration the circumstances surrounding its execution in determining the intent." (alteration in original) (first quoting *K & A Acquis. Grp.*, 383 S.C. at 581, 682 S.E.2d at 262; and then quoting *Williams v. Teran, Inc.*, 266 S.C. 55, 59, 221 S.E.2d 526, 528 (1976))).

Furthermore, the question in *Heffner* was not the same as the question presented in this case. The *Heffner* court concluded its opinion by reiterating that the proposed use of the property in question was "consistent with the combined recreational and residential character of the development." 258 S.C. at 452, 189 S.E.2d at 5. The

court took care to emphasize that it "[did] not intend to imply that the residents of th[e] subdivision would be without remedy against an incompatible use[,]" as "[t]hat question ha[d] not been presented [to the court]." *Id.* The crux of this case is whether Shoestring's proposed development is consistent with the character of the neighborhood, making this case directly distinguishable from *Heffner*. As previously described, there is substantial evidence of a common scheme of development, and we find the deed restrictions created reciprocal negative easements; it follows that neighboring property owners have standing to enforce them.

**Sand Dunes Restriction**

"A homeowner is charged with constructive notice of any restriction properly recorded within the chain of title." *Harbison Cmty. Ass'n, Inc. v. Mueller*, 319 S.C. 99, 103, 459 S.E.2d 860, 863 (Ct. App. 1995). We find the Shoestring parcel is subject to the Sand Dunes Restriction, that the restriction is not overly burdensome, and because the restriction is in line with South Carolina public policy, it may be enforced. *See* S.C. Code Ann. § 48-39-250(1)(a)-(d) (2008) ("The beach/dune system along the coast of South Carolina is extremely important to the people of this State and serves the following functions: (a) protects life and property by serving as a storm barrier which dissipates wave energy and contributes to shoreline stability in an economical and effective manner; (b) provides the basis for a tourism industry that generates approximately two-thirds of South Carolina's annual tourism industry revenue which constitutes a significant portion of the state's economy. The tourists who come to the South Carolina coast to enjoy the ocean and dry sand beach contribute significantly to state and local tax revenues; (c) provides habitat for numerous species of plants and animals, several of which are threatened or endangered. Waters adjacent to the beach/dune system also provide habitat for many other marine species; (d) provides a natural healthy environment for the citizens of South Carolina to spend leisure time which serves their physical and mental well-being.").

The language from the North Litchfield Beach Deed regarding the Sand Dunes Restriction is clear. We emphasize that we fully understand the North Litchfield Beach Deed did not convey title to the Dunes Restricted Area. The trustees retained ownership of this area; however, the conveyance explained:

> [I]t being specifically agreed, however, by and between
> the Grantors and the Grantee that the area of land between
> the lots shown on said plat and the Atlantic Ocean shall

> never be used for the purpose of erecting any building or structure by the Grantors or the Grantee herein, their heirs or assign, or successors.

Not only do we find this language is further evidence of a common plan for development, but the record makes clear that Shoestring had actual knowledge of this restriction and elected to disregard it.

Like the Wallace Deed covenants and restrictions that are readily identifiable in Shoestring's chain of title, the Haun Deed specifically references the Sand Dunes Restriction. The Hauns took the property subject to and with notice of the restriction, and the Shoestring Deed expressly identifies the Sand Dunes Restriction.

Because the Sand Dunes Restriction runs with the Dunes Restricted Area, per a mutually binding agreement under the North Litchfield Beach Deed, and because Shoestring was readily on notice of the restriction in its chain of title, the restriction is enforceable by neighboring property owners.

Based on the foregoing analysis, the master's order is

**AFFIRMED IN PART AND REVERSED IN PART.**[1]

**GEATHERS, HEWITT, and VINSON, JJ., concur.**

---

[1] We decline to address all other issues. *See Futch v. McAllister Towing of Georgetown, Inc.*, 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (noting that when resolution of an issue is dispositive, the reviewing court need not address remaining issues).